# EXHIBIT A

**Westlaw.**

5/10/2000 NYLJ 39, (col. 1)                                                                 Page 1
5/10/2000 N.Y.L.J. 39, (col. 1)

New York Law Journal
Volume 223, Number 90
© 2000 NLP IP Company

Wednesday, May 10, 2000
Court Decisions
Second Judicial Department
U.S. District Court: S.D.N.Y.

Judge Ellis

[Footnotes Deleted for Publication]
GMA ACCESSORIES, INC. V. POSITIVE IMPRESSIONS, INC. QDS:02762414

## I. Introduction

This matter was referred by the Honorable Whitman Knapp on November 4, 1998, for
general pretrial supervision and resolution of dispositive motions. On October 21,
1999, defendant Gootnick Enterprises, d/b/a It's All Greek to Me ("Greek"), sub-
mitted a motion for sanctions against plaintiff GMA Accessories, Inc., ("GMA") for
noncompliance with discovery and destruction of evidence, pursuant to Rule 37 of
the Federal Rules of Evidence. After conducting an evidentiary hearing on the mat-
ter on February 17, 2000, and for the following reasons, the Court GRANTS Greek's
motion for sanctions and the plaintiff shall pay all of Greek's reasonable ex-
penses incurred in securing the discovery sought, plus an additional $10,000. Ad-
ditionally, the Court orders John Bostany, counsel for GMA, to pay $5,000 as a
sanction for his misrepresentations to the Court and tactical maneuvering.

## II. Background

This case involves particularly contentious counsel with an affinity for protrac-
ted motion practice. For purposes of this motion, the tortured procedural history
has been distilled to these essential facts. On May 22, 1998, plaintiff GMA filed
a complaint alleging trademark infringement in violation of the Lanham Act, 15
U.S.C. §1115(b), regarding the use of plaintiff's trademarked phrase "Floppy
Friends" in connection with Greek's manufacturing, sale and distribution of soft
plush toys. On September 1, 1998, Greek served document requests on GMA seeking
production of sale invoices of the product "Floppy Friends." See Def. Mem. at 2.
In its response to Greek's request for production of documents, GMA refused to
produce any invoices, objecting to the request as being "privileged, unlikely to
lead to discoverable evidence, irrelevant and immaterial to the claims asserted by
the plaintiff." Def. Mem., Exh. 3 at 4. A pretrial conference was held before the

Copyright © 2008 The New York Law Pub. Co.

Court on April 16, 1999, whereby the Court found the discovery to be relevant and ordered GMA to produce the sale invoices. See Def. Mem., Exh. 4 at 62. The Court followed this oral ruling with a written Order, ordering production by May 3, 1999. See 4/20/99 Order. GMA failed to comply with this Order by not producing the invoices to Greek. In response to this failure, the Court directed GMA to show cause why sanctions should not be imposed on them pursuant to Rule 37 (b) and (d) of the Federal Rules of Civil Procedure. See 5/7/99 Order.

A. Failed Inspection of the Invoices

In response to the Show Cause Order, GMA filed a response, stating that Greek "may inspect plaintiff's invoices at its warehouse in New Jersey within the next 30 days at a date to be proposed by defense counsel." See Def. Mem., Exh. 8 at 3. The inspection of the documents was scheduled to take place on July 1, 1999, at 2:00 p.m., and on July 6, 1999, at 12:00 p.m. See Def. Mem., Exh. 9.

What transpired on July 1, 1999, is contested between the parties. Greek filed a motion to dismiss the case for noncompliance with discovery and destruction of evidence on October 21, 1999. In its submissions, Greek maintains that on July 1st at 2:00 p.m., a representative of Greek, a paralegal named Eric Whitman, went to Secaucus, New Jersey, to conduct the scheduled inspection. See Def. Let. at 3. When Whitman arrived at the warehouse, the warehouse manager, named "Mike," told him that "no one had advised him that anyone was coming to inspect any documents on that date and further, that all such records were kept at the office of the comptroller in New York City." See Whitman Aff. at 3. Subsequently, Whitman was denied access to the GMA warehouse and the discovery inspection did not take place on July 1, 1999. On July 13, 1999, Greek sent a letter to GMA, stating that it was not allowed access to the documents for inspection on July 1st, and requesting that the documents be copied and sent to Greek. See Def. Mem., Exh. 10.

In response to the motion to dismiss, GMA maintains a different version of events in direct contravention to Greek's account. First, John Bostany, counsel for GMA, by way of letter to this Court, called into question the veracity of Whitman's account, stating Greek "wants us to believe that on July 1st his paralegal visited GMA for an inspection of documents, spoke to someone named 'Mike' and then just turned around and went back to New York ... ." See 10/25/99 Pl. Let. Subsequently, by way of affidavit, Bostany again questioned the truthfulness of Greek's contention that Whitman attempted the inspection, by stating "Whitman claims that he spoke to a person named 'Mike' and never asked for" the person responsible for the document production, William Maloof. See Bostany Aff. at 11. In support, plaintiff provided an affidavit of Maloof, the Chief Executive Officer of GMA, who stated:

On July 1 and July 6, 1999, I was present at the Secaucus warehouse prepared to allow the attorneys for the defendant in this case to inspect all of our purchase orders and invoices pertaining to Floppy Friends. On neither of those dates did the attorneys for the defendant arrive for an inspection.

Copyright © 2008 The New York Law Pub. Co.

5/10/2000 NYLJ 39, (col. 1)                                                                    Page 3
5/10/2000 N.Y.L.J. 39, (col. 1)

Maloof Aff. at 3.

Additionally, Bostany pointed to the fact that the car service voucher of Whit-
man's alleged attempt indicated that he traveled to 231 Secaucus Road, not 245 Se-
caucus Road, which is where the warehouse is located. See Bostany Aff., 10. GMA
further contended that the motion should be denied because Greek has refused to
cooperate by taking its invitation to schedule a further inspection, or agree to
copying of the documents at Greek's expense. See id. at 12; Pl. Cross Mot. at 7.

### B. Spoilation of Evidence

Greek also argues that GMA has destroyed key evidence in this case by intention-
ally discarding the invoices pertaining to one of the products, the Floppy Friends
"moose." Greek points to Bostany's representation to Magistrate Judge Pisano in
the District of New Jersey, by which he asserts that "GMA moved its records to its
corporate office in Secaucus, New Jersey earlier this year and in the process dis-
carded all old (pre-1998) purchase orders and invoices." See Def. Mem., Exh. 21 at
2. Greek maintains that it was this disclosure of spoilation of evidence that
prompted this aspect of the instant motion.

In response to the instant motion, Bostany represented to this Court that "[n]one
of those invoices or purchase orders were destroyed as defense counsel suggests."
10/25/99 Pl. Let. at 1.

### C. Default on Court Ordered Deposition

Greek served a notice for the deposition of Maloof on September 24, 1998. The de-
position did not take place, and again, the surrounding circumstances are con-
tested between the parties. On April 20, 1999, by way of written order, this Court
ordered GMA to comply with Greek's notice of deposition for Maloof, and ordered
GMA to schedule a date for the deposition to take place. See 4/20/99 Order. After
several scheduling problems, the deposition was scheduled for July 13, 1999.
However, Maloof did not appear on this date, and a default appearance was noted on
the record. See Def. Mem., Exh. 27. GMA did send a facsimile to Greek the evening
before the scheduled deposition, on July 12, 1999, by which GMA indicated that
Greek had canceled the Maloof deposition. See id. at Exh. 26. It appears from the
record that Greek canceled two other depositions which were scheduled for July 8th
and 9th, which Greek informed GMA by facsimile dated July 7th. See id. at Exh. 25.

In response to this motion, GMA filed a cross motion for fees and costs pursuant
to 28 U.S.C. §1927 for "vexatiously and frivolously increasing the costs of pro-
secuting this trademark infringement action." See Pl. Cross Mot.

### III. FINDINGS OF THE EVIDENTIARY HEARING

The Court held an evidentiary hearing on this matter on February 17, 2000. A sum-

Copyright © 2008 The New York Law Pub. Co.

5/10/2000 NYLJ 39, (col. 1)
5/10/2000 N.Y.L.J. 39, (col. 1)

mary of each parties testimony is as follows.

### A. Greek's Version

For Greek, Whitman testified that he first went to 245 Secaucus Road, and was greeted by a secretary, whom he showed a business card. See Tr. at 34-35. After informing her that he was here to do a document inspection, the secretary told him to go to 231 Secaucus Road and ask for the warehouse manager, "Mike." See id. At the 231 Secaucus Road location, Whitman spoke to a person who identified himself as "Mike," and informed him that he was there to inspect purchase orders and invoices in the "GMA Accessories versus It's Greek to Me" matter, which was to have been arranged for this date and time by Bostany. Id. at 38. The warehouse manager, Mike, informed Whitman that he knew of no such inspection, that "the documents were not at the Secaucus warehouse location, they were in fact under the control of Mr. Maloof in a downtown New York City location." Id. Whitman proceeded to leave, without having completed the inspection.

### B. GMA's Version

For GMA, Maloof testified that he was available and ready to assist defendant in the inspection, but no one came to the warehouse at 245 Secaucus Road to inspect the documents. See id. at 54. Additionally, Masoud Altirs, who admitted that he uses the name "Mike," testified for GMA that he is the Vice-President of GMA, and that he had not been advised that someone would be inspecting documents. Altirs also testified that a man, later identified as Whitman, did come to the warehouse, asked for him and stated that he "was here to for the inspection." Id. at 78. Altirs stated that Whitman did not give him his name, did not say where he was from, would not give him a business card, and left quickly. Id.

Also significant to GMA's presentation of evidence was the unannounced delivery of several large boxes, delivered to the courtroom in the midst of the evidentiary hearing. GMA represented that the boxes contained the invoices at issue, which were copied by "plaintiff at its own expense ... of over $5,000 for almost 30,000 documents ... ." Pl. Mem. at 7. The Court finds this significant given the previous position taken by GMA, that the production was "overly burdensome," and inspection of the documents was the only means by which the discovery was made accessible to the defendant. The Court also notes that GMA offered to copy the discovery at issue only after the filing of the motion to dismiss, and made the offer by way of several facsimiles to defendant. See Pl. Mem., Exh. C.

Regarding the "moose" invoices, Maloof testified to the Court that these invoices were "lost" in transit between New York and New Jersey. See Tr. at 69.

### C. Conclusion

Based on the evidence at the hearing and the submitted affidavits, the Court

Copyright © 2008 The New York Law Pub. Co.

5/10/2000 NYLJ 39, (col. 1)
5/10/2000 N.Y.L.J. 39, (col. 1)

finds the testimony of Whitman to be credible, that he went to the appropriate site, properly identified himself, and was told that the inspection would not take place. The Court finds that Whitman was affirmatively misled when he was sent from the 245 location to the 231 location and when he was told that the documents were under Maloof's control in New York City. The Court finds that it is not credible, given the history of this case, that the only person at the site who was expecting an inspection was Maloof. The Court specifically discredits the testimony that the person in charge of the warehouse was not told and that the receptionist was not alerted to the arrival of anyone with respect to the inspection. However, even if the Court were to fully credit Maloof's testimony, he did nothing to facilitate the inspection. This was an insufficient response to the Court's Order on inspection. The Court is left with the unmistakable impression that neither GMA nor Bostany was seriously interested in complying with the discovery request or the Court's Order. Given this willful behavior and the history of this case, the Court finds sanctions appropriate in this case. The Court will thus consider the appropriate sanction for this noncompliant behavior.

## IV. DISCUSSION OF SANCTIONS

Rule 37 of the Federal Rules of Civil Procedure provides, in relevant part:

If a party ... fails to obey an order to provide or permit discovery, ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

An order ... dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.

In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order ... to pay the reasonable expenses, including attorney's fees caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an aware of expenses unjust.

Fed. R. Civ. P. 37(b)(2).

Orders of dismissal or default are the "[h]arshest of all" sanctions available under the rule, see, e.g., Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d 1062, 1066 (2d Cir. 1979), and are to be used only after (1) the court finds willfulness, bad faith, or fault in the course of discovery and (2) the court gives notice that violation of the court's order will result in a dismissal of the case with prejudice. See Simmons II v. Abruzzo, 49 F.3d 83, 88 (2d Cir. 1995). While dismissal and default are extreme remedies, "in this day of burgeoning, costly and protracted litigation, courts should not shrink from imposing harsh sanctions where ... they are clearly warranted." Jones v. Niagara Frontier Transp. Auth., 836 F.2d 731, 731 (2d Cir. 1987). The Second Circuit has

Copyright © 2008 The New York Law Pub. Co.

warned, "a party who flouts [discovery] orders does so at his own peril." Sieck v.
Russo, 869 F.2d 131, 133 (2d Cir. 1989) (quoting Update Art, Inc. v. Modiin Pub-
lishing, Ltd., 843 F.2d 67, 73 (2d Cir. 1988)).

In American Cash Card Corp. v. AT&T, 184 F.R.D. 521 (S.D.N.Y. 1999), the court
outlined six factors to consider when contemplating the imposition of the litiga-
tion-ending sanction for discovery abuse:

   (a) willfulness or bad faith on the part of the noncompliant party; (b) the
history, if any, of noncompliance; (c) the effectiveness of lesser sanctions; (d)
whether the noncompliant party had been warned about the possibility of sanctions;
(e) the client's complicity; and (f) prejudice to the moving party.

Id. at 524. The deciding court should also balance "the need for general de-
terrence and docket control" and "the preference for resolving cases on their mer-
its." Id. With these guidelines, the Court will examine GMA's conduct in discov-
ery.

            A. Willfulness or Bad Faith; the History of Noncompliance
GMA's disobedience has been willful, as demonstrated by: (1) its repeated failure
to comply with the Court's orders to supply defendant with the invoices at issue;
(2) its obvious distortion of the facts in its submissions prior to the hearing
surrounding Greek's investigation attempt; (3) its distortion to the courts in
differing submissions regarding the "moose" invoices; and (4) its tactic of sur-
prise unloading of the documents at the evidentiary hearing.

First, GMA was ordered by the Court to produce the invoices orally on April 16,
1999, and by written order on May 3, 1999. When GMA failed to do so, the Court is-
sued a Show Cause Order on May 7, 1999. Following a conference with the parties,
GMA agreed to allow an inspection by June 12, 1999, at a date proposed by Greek.
At this point, GMA was on notice of the possibility of sanctions. The Court expec-
ted that GMA, having previously been ordered to produce the invoices, would take
the necessary steps to insure they were available to defendant. This would include
notifying appropriate personnel of plaintiff when and where the inspection was to
occur and making sure that such personnel were available and prepared to assist so
that the inspection went smoothly. It is obvious from the facts presented that at
best GMA took a passive approach to the inspection. Given the Court's previous or-
der to produce the subject invoices, GMA's behavior constitutes willful noncompli-
ance.

More disturbing to the Court, however, is the behavior of GMA's counsel, John
Bostany. Combining the talents of an old carnival huckster and an ancient Greek
sophist, Bostany has undertaken to impose upon the Court a kind of shell game, us-
ing language to misdirect and mislead, until finally delivering the invoices to
the courtroom. This dramatic flourish might be appropriate for Madison Square

Copyright © 2008 The New York Law Pub. Co.

Garden, but not the Southern District of New York.

An examination of Bostany's submissions shows the continual pattern of deception.

1. Whitman's Visit to Secaucus

a. What GMA and Bostany Said

In Bostany's letter to the Court dated October 25, 1999, he states that Greek "wants us to believe that on July 1st his paralegal visited GMA for an inspection of documents, spoke to someone named 'Mike.' " 10/25/99 Pl. Let. In his affidavit dated December 13, 1999, Bostany states that "Whitman claims that he spoke to a person named 'Mike.'" Bostany Aff. at 11. In his affidavit dated November 3, 1999, William Maloof, the CEO of GMA stated that "on neither of those dates did the attorneys for the defendant arrive for an inspection." Maloof Aff. at 3.

b. Impressions Conveyed

These factual assertions and sworn statements suggest that: (1) no one named Mike works for GMA; and (2) no one appeared for defendant for the scheduled inspection.

c. The Truth

During the evidentiary hearing held on February 17, 2000, it was established that: (1) "Mike" is the name commonly used for Masoud Altirs, vice-president and warehouse manager for GMA; and (2) although he was not an "attorney," Eric Whitman, a paralegal employed by the attorneys for Greek, did appear, did talk to Altirs, and did indicate that he was there for an "inspection."

2. The Warehouse Address

a. What GMA and Bostany Said

In response to defendant's motion for sanctions, Bostany affirmed that "defense counsel annexed a copy of a voucher supposedly utilized by defense counsel's paralegal, Eric Whitman to arrive at the Secaucus' warehouse. The car service voucher, annexed hereto as Exhibit B, indicates that Mr. Whitman traveled to 231 Secaucus Road to conduct an inspection. Yet, the plaintiff's warehouse is located at 245 Secaucus Road." Bostany Aff. at 10. Bostany also makes the sworn statement that "[Whitman] allegedly arrived at 231 Secaucus Road and spoke to an individual named 'Mike.'" Id. at 11.

b. Impressions Conveyed

Bostany's sworn statements suggest that Whitman went to the wrong address and that this might explain the failed inspection.

c. The Truth

Copyright © 2008 The New York Law Pub. Co.

At the evidentiary hearing, it was established that both addresses belong to GMA and are merely separate entrances to a large building. In any case, Whitman appeared at both addresses on the scheduled day.

### 3. The Invoices for the "Moose" Floppy Friend

#### a. What GMA and Bostany Said

Bostany represented to Magistrate Judge Pisano in the District of New Jersey that "GMA moved its records to its corporate office in Secaucus, New Jersey earlier this year and in the process discarded all old (pre-1998) purchase orders and invoices." See Def. Mem., Exh. 21 at 2 (emphasis added). At the time of this disclosure on October 14, 1999, an Order from this Court was in effect requiring the discovery of invoices to be given by May 3, 1999. Included in this discovery would be the moose design, as it is a "Floppy Friend." Then, Bostany later retracted that statement, by stating to this Court that "[n]one of those invoices or purchase orders were destroyed as defense counsel suggests." 10/25/99 Pl. Let.

#### b. Impressions Conveyed

Based on the first assertion, it appeared that all invoices had been discarded. However, Bostany's later affirmation conveyed to the Court that GMA had not discarded any invoices, and therefore, the invoices were available for discovery purposes.

#### c. The Truth

At the evidentiary hearing, it was established that the "moose" invoices were indeed "lost," but the others were still in GMA's possession.

No statement, on its own and on its face, can be said to be an explicit lie by Bostany. However, counsel continually made statements to the Court regarding these incidents were designed to leave the Court with false impressions, when GMA and Bostany knew facts which contradicted these impressions. Calculated deception to the Court to this degree is not tolerable and is sanctionable.

To compound his transgression, without requesting permission or otherwise informing the Court or defendant, Bostany had a third party deliver multiple storage boxes of documents to the courthouse while testimony was being taken on defendant's motion. While Bostany contends this display exhibits GMA's good faith, the Court views it as a calculated stunt to sidetrack the issue of defendant's motion for sanctions in the midst of the presentment of evidence. Additionally, it underscores the relative ease with which this evidence could have been delivered to defendant, but was not. Throughout these discovery disputes, plaintiff has maintained that it was extremely burdensome to identify and/or copy the invoices. Even after this Court's Order to Show Cause of May 7, 1999, GMA kept up this mantra of burdensomeness at a conference before the Court. It therefore agreed to allow an

Copyright © 2008 The New York Law Pub. Co.

5/10/2000 NYLJ 39, (col. 1)
5/10/2000 N.Y.L.J. 39, (col. 1)

inspection within "30 days." Despite these protestations, once GMA ascertained that the Court would actually hear the motion for sanctions, including dismissal, it somehow found the wherewithal to identify, copy, and deliver the invoices to the courtroom in a relatively short time period.

### B. Client's complicity

Another factor that weighs in favor of imposing sanctions against GMA is the client's complicity. It is clear that GMA itself must share responsibility for the discovery failure herein. The testimony of two of the principals, Maloof and Altirs, makes clear that they were, at best, negligent in their response to the Court's Order to produce the invoices. Maloof, the chief executive officer, testified that he did not tell anyone at the Secaucus warehouse that someone was coming to inspect documents on July 1st, even though he could not continuously view the reception area from his office, and therefore was not able to see everyone who entered the premises. See Tr. at 75-76. Given the history of noncompliance in this case, such a cavalier approach to discovery would in itself be sanctionable. The Court, however, finds that Maloof's behavior consisted of more than mere negligence. It is simply not credible that a major discovery endeavor was not communicated to other personnel, including the custodian of the records. Maloof compounded his malfeasance by submitting an affidavit indicating that no "attorneys" arrived for inspection. This statement was obviously designed to mislead the Court.

The Court also finds not credible Altir's testimony that he was unaware of the inspection. It borders on ludicrous to suggest that he believed this "inspection" was for inspection of the warehouse lights, as suggested at the evidentiary hearing. See Tr. at 81.

For these reasons, the Court finds that plaintiff, through its officers, shared in the knowledge of the nonproduction of the subject invoices.

### C. Prejudice to the Moving Party

Another factor weighing in favor of severe sanctions is that Greek has been prejudiced by GMA's nonproduction of discovery. Greek first sought the invoices on September 1, 1998. Now, more than eighteen months later, GMA dumps the files at the hearing on sanctions. Greek has had to devote extensive time and resources in trying to obtain the discovery at issue and the development of the case has been delayed.

### D. Effectiveness of Lesser Sanctions; Warnings about the Possibility of Sanctions

In response to the motion, GMA denies that it violated an explicit court order, arguing that "defendant does not point to any order that was entered that required the plaintiff to produce its invoices in any fashion different than the way the

Copyright © 2008 The New York Law Pub. Co.

plaintiff went about producing them." Pl. Mem. at 7-8. The Court does not accept
this argument. At the April 16th conference, the Court ordered GMA to produce the
invoices. This oral ruling was following by a written order, dated April 20, 1999.
The May 7th Show Cause Order further mandated compliance by GMA to produce the or-
ders. The fact that GMA and Greek agreed to an inspection of the documents, as op-
posed to photocopying them, does not excuse GMA from its obligation to produce the
documents in some form. GMA argues that it is not responsible for the failed in-
spection "because the defendant did not ask for Maloof when its agents arrived at
the warehouse." Id. at 4. As outlined above, the Court does not find this argument
persuasive and holds GMA responsible for its failure to ensure the production of
the discovery.

GMA further argues that Greek has not been "seriously prejudiced" by the discov-
ery violation. The Court disagrees. A one and a half year delay in receiving the
invoices is prejudicial. Moreover, Greek has had to spend considerable time and
expense bringing this violation before the Court. GMA's eleventh hour delivery at
the courthouse only serves to underscore the ease of which the discovery could
have been produced, but was not.

Lastly, GMA argues that Greek failed to follow the proper procedure in resolving
the dispute before making motions to the Court. GMA believes Greek's motion for
sanctions was "unripe and malicious." See Pl. Resp. at 6. It relies on a recent
decision of this Court, A.I.A. Holding S.A. v. Lehman Brothers, Inc., 2000 WL
98315 (S.D.N.Y. Jan. 26, 2000), for the legal principle that parties must meet and
confer prior to making motions to the Court. In A.I.A. Holding S.A., the defendant
moved for sanctions for discovery abuse and this Court found that, while abuse did
occur in the case of one of the plaintiffs in the class, defendants should be ad-
monished, and should not benefit from their exceedingly protracted motion prac-
tice. See id. Such is not the case here. Here, Greek has been seeking discovery
compliance for more than one year. Each time Greek has agreed to modify its posi-
tion to obtain the discovery to which it is entitled. The Court finds that GMA has
made it clear that its agreements to cooperate were specious and designed only to
delay.

While GMA has not been subjected to sanctions in the traditional sense, its con-
tumacious behavior has resulted in actions by the Court which acted as penalties
for wrongful behavior. First, in November of 1998, Judge Knapp vacated the prelim-
inary injunction in this case, when GMA failed to return customer lists to defend-
ant. Second, in December of 1998, GMA was directed by this Court to notify 1,100
customers that they need not respond to the Amended Complaint because GMA used the
customer list improperly. Next, in January of 1999, GMA's attempt to join these
same customers as defendants was denied by this Court.

Moreover, GMA has engaged in the practice of brinkmanship, waiting until the last
minute and then agreeing to a course of action to avoid sanctions. At the same
time, GMA has filed numerous motions seeking sanctions against defendants, dis-

Copyright © 2008 The New York Law Pub. Co.

tracting both the Court and defendant. The net result is that the Court has not had the opportunity to gauge the effectiveness of sanctions less than dismissal.

In sum, sanctions against GMA are warranted. On this record, the Court does not find that the extreme measure of dismissal is called for. However, GMA has flouted its obligations and under such circumstances, an intermediate sanction is warranted. The Court considers GMA's noncompliance a continuing violation. Otherwise, GMA will be rewarded for last minute agreements which avoid sanctions, but only serve to delay production of the relevant documents. Because Greek had to bring the motion on more than one occasion, all of its efforts will be considered together. Greek is specifically not required to pay for any copying costs associated with the boxes delivered to the Court and may take possession of such boxes upon notice to the Court. The cost of retrieving and transporting the boxes shall be added to their costs associated with this motion. GMA will pay all of Greek's reasonable expenses incurred in seeking to have GMA produce the "Floppy Friends" invoices, and an additional $10,000. This specifically includes all letter requests and appearances at discovery conferences before the Court. Moreover, for his deception to the Court, effective "road-blocking" to this case, and tactical maneuvering regarding the boxes of discovery, the Court orders Bostany to pay $5,000 in sanctions. Bostany is also ordered to turnover to Greek any and all customer lists in its possession or being held by John W. Johnson.

Greek shall submit a summary of expenses and attorney's fees incurred in its attempt to procure the invoices.

### V. Conclusion

For the reasons stated, defendants' motion for sanctions is GRANTED. GMA shall pay all of defendant's reasonable attorney's fees and expenses incurred in attempting to secure production of the "Floppy Friends" invoices, plus an additional $10,000. Additionally, the Court orders Bostany to pay $5,000 as a sanction for his misrepresentations to the Court and tactical maneuvering.

So Ordered.

5/10/2000 NYLJ 39, (col. 1)

END OF DOCUMENT

Copyright © 2008 The New York Law Pub. Co.

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SANEI CHARLOTTE RONSON LLC,

Plaintiff,

**DEFENDANT'S INITIAL DISCLOSURES**

- against -                                    Civil Action No.: 07CV9578 (CM)

GMA ACCESSORIES, INC.,

Defendant.

-----------------------------------------------------------------X

GMA Accessories, Inc., (hereinafter "GMA"), by and through its attorneys, The Bostany

Law Firm, hereby provides the following pursuant to Fed.R.Civ.P. 26(a)(1):

    A.  Defendant identifies the following witnesses:

        a.  William Maloof - Advertising and Sales

        b.  George Altirs - Adoption and Use of mark.

    B.  Defendant respectfully refers to the documents identified in the C. Ronson TTAB

proceeding and the *GMA v. Eminent* case.  In addition, Sales Orders, Advertising

Expenses, Advertisements and Cease and Desist communications.

    C.  Defendant is being damaged by expending excessive attorney fees litigating the

same issues in multiple tribunals.

    D.  No insurance coverage.

Dated: New York, New York
      December 17, 2007

THE BOSTANY LAW FIRM

By: _____
John P. Bostany

# EXHIBIT C

# THE BOSTANY LAW FIRM

### 40 WALL STREET

### 61ST FLOOR

### NEW YORK, NEW YORK 10005-1304

TEL: 212-530-4400

FAX: 212-530-4488

NEW JERSEY OFFICE

ONE GATEWAY CENTER
NEWARK, NJ 07102

December 4, 2007

Ira S. Sacks, Esq.
Dreier LLP
499 Park Avenue
New York, NY 10022

Re:     *GMA v. Eminent, Inc., et. al.*
         Docket No.: 07 CV 3219 (LTS)(DCF)

Dear Mr. Sacks:

Further to our discussions, at your request, the documents mentioned in our initial disclosures can be found as follows:

— <u>Advertisements</u>: Exchanged in Requests for Admissions.

<u>Sales Orders</u>: Plaintiff presently plans to introduce the summaries attached to the Maloof Declaration dated May 23, 2007 exchanged with your firm in *GMA v. C. Ronson* pending in TTAB (the "RONSON case").

<u>Advertising Receipts</u>: Plaintiff presently plans to introduce the summaries attached to the Maloof Declaration dated May 23, 2007 exchanged with your firm in the RONSON case.

— <u>Cease and Desist Communications</u>: Annexed to Requests for Admission and Sweeney Declaration. Both documents were served upon you in this case.

— <u>Public Documents</u>: Exhibits to filings in both this case and RONSON, as well as file wrappers for the CHARLOTTE marks registered to GMA and/or mentioned in the Briefs in both cases.

Sincerely,

John P. Bostany

cc: Robert Carrillo, Esq.

# EXHIBIT D

```
 1                      UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF NEW YORK
 2

 3   SANEI CHARLOTTE RONSON LLC,      .    Case No. 07-cv-09578-CM-DCF
                                      .
 4                      Plaintiff,    .
                                      .    New York, New York
 5              vs.                   .    Friday, March 14, 2008
                                      .
 6   GMA AACCESSORIES, INC.,          .
                                      .
 7                      Defendant.    .
     . . . . . . . . . . . . . . .    .
 8

 9                       TRANSCRIPT OF CONFERENCE
                   BEFORE THE HONORABLE DEBRA C. FREEMAN
10                   UNITED STATES MAGISTRATE JUDGE

11
     APPEARANCES:   (On the record)
12

13   For the Plaintiff:          Ira S. Sacks, Esq.
                                  Safia A. Anand, Esq.
14                                Mary L. Grieco, Esq.
                                  Rob Grand, Esq.
15                                DREIER LLP
                                  499 Park Avenue
16                                New York, New York 10022

17   For the Defendant:          John Bostany, Esq.
                                  THE BOSTANY LAW FIRM
18                                40 Wall Street
                                  New York, New York 10005

19

20   Audio Operator:             Electronically Recorded
                                  by Court Personnel
21

22   Transcription Company:      Rand Reporting & Transcription, LLC
                                  80 Broad Street, Fifth Floor
                                  New York, New York 10004
23                                (212) 504-2919
                                  www.randreporting.com
24
     Proceedings recorded by electronic sound recording, transcript
25   produced by transcription service.
```

1    declaration is.

2    　　　　　THE COURT:  The day of the Sweeney declaration, and on

3    the public documents, the last bullet point of that December

4    letter.  What public documents are you referring to?

5    　　　　　MR. BOSTANY:  Yeah.  He says the -- he specifies what

6    they are in there.  So I was going to tell Mr. Sacks that they

7    specified the Charlotte file wrappers, and he specifies

8    exhibits in this case, which we wouldn't even have had to

9    specify.  I mean, they're admissible anyway.

10   　　　　　THE COURT:  Wait a minute.  Wait a minute.

11   　　　　　MR. BOSTANY:  Exhibits in the case are on file in the

12   clerk's office.

13   　　　　　THE COURT:  Wait a minute.  I've got to pull it out

14   again.

15   　　　　　Filings -- you said exhibits to filings and the file

16   wrappers.  The file wrappers, you -- that's narrow enough,

17   right?  Is it the exhibits to filings that's the problem?

18   　　　　　MR. SACKS:  I know -- I mean, it's -- the file

19   wrappers are big, but if he's relying on them, I know what

20   those are.

21   　　　　　THE COURT:  You what they are.  They're exhibits to

22   filings.  You know what that means?

23   　　　　　MR. SACKS:  No.  I mean, I know what it's -- there

24   have been many filings in the Eminent case, which is what he's

25   talking about.  There have been many, many filings in the

1   <u>Ronson</u> case, in the <u>Ronson</u> TTB case, PTAB case.

2          THE COURT:  All right.  So which exhibits to which

3   filings?

4          MR. BOSTANY:  But, Judge, I mean, these are filings in

5   a trial.  You're allowed to --

6          THE COURT:  But realistically in this -- realistically

7   in <u>Sanei</u>, are you as part of your 26(a) disclosures --

8          MR. BOSTANY:  It's all fair game.  At a trial it's all

9   fair game.  It's been filed on the case in the clerk's office,

10  and if you whip it out at a trial, you can use it.

11         THE COURT:  That's not the question.  The question is

12  documents that you may use to support your claims or defenses.

13  Are you saying that you may use every filing, every exhibit in

14  every filing in <u>Eminent</u> and in <u>Ronson</u> to support your claims or

15  defenses in this case?

16         MR. BOSTANY:  Obviously, and more, and more.  We would

17  have filed them if they weren't germane.

18         THE COURT:  He's saying all of them.

19         MR. SACKS:  Your Honor --

20         MR. BOSTANY:  We filed them to a district judge.

21         MR. SACKS:  And I'd like to make sure he's produced

22  them in the <u>Sanei</u> case because we have a document request that

23  says produce all documents identified in your Rule 26(a)

24  disclosures.

25         THE COURT:  Well, I didn't say he needed to produce

1    them.  What I needed -- what I said was he needed either to

2    produce them, make them available for inspection, point out to

3    you where they had been previously produced.  I will add that

4    if they are equally available to both sides through public

5    sources.  I don't know if that would be the case here.

6         MR. SACKS:  They are.

7         THE COURT:  Then that's also reasonable.

8         MR. SACKS:  Here's my problem, Your Honor, and I'll

9    wait to go through it.  If I go back to the office and we go

10   through the filings in the TTAB proceeding, all of them, I'll

11   bet you in an hour I could find a dozen of them that does --

12   that don't have anything to do with this litigation.  And I

13   believe that what Mr. Bostany is doing is just dumping another

14   group of twenty or 30,000 documents on us that we will not know

15   which documents he's really relying on.

16        THE COURT:  How many are we talking about and --

17        MR. BOSTANY:  Yeah.  Where do I say all filings in all

18   TTAB cases?

19        THE COURT:  You don't.  In the December 4 letter in

20   the Eminent case where it says public documents, it says,

21   "Exhibits to filings in both this case and Ronson."  It doesn't

22   say which exhibits.

23        MR. BOSTANY:  Right.  It doesn't say all -- no.  He

24   just said, I'll go and I'll find all --

25        THE COURT:  Well, I just asked you does this mean all

71

1    exhibits to all filings, and you said absolutely yes.

2         MR. BOSTANY:  No, no.

3         THE COURT:  If it's not absolutely yes, then you need

4    to say which ones.

5         MR. BOSTANY:  But, Judge, what Mr. Sacks just argued

6    is what I'm disagreeing with.  Not my answer to you.  I stand

7    by my answer to you, but his question was different.  He said,

8    I'll go to the TTAB website and I'll look at all cases GMA has

9    ever started against other parties, and I'll find stuff in

10   there that's not relevant.

11        MR. SACKS:  No.  That's not what I said.

12        THE COURT:  Hold on.  This case and Ronson?

13        MR. SACKS:  This case and the -- my understanding of

14   his letter of December 4 was exhibits to filings in the Eminent

15   case.

16        THE COURT:  Right.

17        MR. SACKS:  And exhibits to filings in the Ronson TTAB

18   proceeding.  And what I'm saying is that if I go to the Ronson

19   TTAB proceeding, I'm sure there are numerous exhibits to

20   filings in the Ronson TTAB proceeding that don't have any

21   remote relevance to this case.

22        THE COURT:  To Sanei.

23        MR. SACKS:  And I think what we're doing is getting an

24   ocean to look through.

25        MR. BOSTANY:  Then why would they have been filed in a

1   trademark proceeding if they have no remote relevance to a

2   federal trademark proceeding?

3           MR. SACKS:  Because there are different issues.

4           MR. BOSTANY:  I disagree.

5           MR. SACKS:  But if that's what Mr. Bostany is saying,

6   and if he's represented that on the record, I will go and look

7   in the TTAB proceedings.  And if I believe that Mr. Bostany is

8   relying on things, we'll come back to Your Honor.

9           MR. BOSTANY:  Judge, he's the attorney on the case in

10  the trademark proceeding.  He's making it sound like he has to

11  go do new work.  He's -- this is his -- that's his case.

12          MR. SACKS:  I believe that this is a baseless Rule

13  26(a) disclosure.

14          THE COURT:  Mr. Bostany?  Mr. Bostany, the purpose of

15  Rule 26(a), okay, is to take the key documents that you may be

16  relying on in this case and make sure the other side has them

17  even before discovery.  It's not -- you know, it's not to dump

18  a huge universe of documents that may have relevant stuff and

19  may not have relevant stuff.  It's to identify the documents

20  you really may be using in this case that you know you really

21  may be using in this case.

22          MR. BOSTANY:  Judge --

23          THE COURT:  That's what 26(a) is for.

24          MR. BOSTANY:  The trademark proceeding --

25          THE COURT:  Right.

73

1          MR. BOSTANY:  -- is to determine the validity of the

2   Ronson mark.

3          THE COURT:  Right.

4          MR. BOSTANY:  How is that not relevant to a trademark

5   proceeding?

6          THE COURT:  I don't --

7          MR. SACKS:  That's --

8          THE COURT:  Stop.  I do not know how --

9          MR. BOSTANY:  It --

10          THE COURT:  I do not know how many filings there were,

11  how many exhibits there were to these filings, what the issues

12  were, what the -- whether the issues are the same issues being

13  raised here or are different issues that are being raised here.

14  I don't know whether this is a document dump or this is not a

15  document dump, but I will caution you, I don't like document

16  dumps.

17          MR. BOSTANY:  No, Judge.

18          THE COURT:  If it is not --

19          MR. BOSTANY:  It's not.

20          THE COURT:  -- fine.

21          MR. BOSTANY:  It's not.

22          THE COURT:  And we have your statement on the record.

23  If it is, I'm sure I'll be hearing about it down the road.  And

24  Mr. Sacks will be coming in with examples of things that are

25  exhibits to filings and will be putting it to you to say, why

74

1   did you make me go look at this, this, this, and this, and

2   you'll have to explain yourself.

3          MR. BOSTANY:  But let me ask you a question.  If the

4   document-intensive nature of the TTAB case are filings that his

5   firm made because they filed 1,000, 1,500 documents.

6          THE COURT:  But this is not what he has knowledge of.

7   This is what your client, as of this point in time, or as a

8   beginning point in time, but it wasn't done, so now it will be

9   done, feels that it may be relying on in this case, in this

10  case.  That's your obligation under Rule 26(a).  It's not the

11  obligation to push it off on someone else.

12         MR. BOSTANY:  If he's --

13         THE COURT:  If he goes -- I'll tell you now, you have

14  a choice.  You can stick with your representation on the record

15  that all of it you believe are documents you may be using in

16  this case to support your claims or your defenses in this case.

17         MR. BOSTANY:  Absolutely.

18         THE COURT:  Okay.

19         MR. BOSTANY:  Absolutely.

20         THE COURT:  Fine.  Or --

21         MR. BOSTANY:  Absolutely.

22         THE COURT:  Okay.  Or you can narrow it.  If you --

23         MR. BOSTANY:  It's a trademark --

24         THE COURT:  Mr. Bostany.

25         MR. BOSTANY:  Trade -- it's not even --

1    THE COURT:  Mr. Bostany, you have to learn that --

2    MR. BOSTANY:  You keep asking me the question so many

3    times.

4    THE COURT:  You have to learn --

5    MR. BOSTANY:  You're trying to scare me.

6    THE COURT:  You have to learn that if the judge is

7    talking, you stop.  Okay?  If Mr. Sacks starts going through

8    all those records and starts finding a whole bunch of things

9    that seem to have no bearing on any issue in this case, it

10   sounds like he may come back to me and he may put it to you as

11   to why you made him go through all of this.  And then I may be

12   see -- be hearing something about what ought to happen next.

13   So, you know, be sure of what you say.  You sound very

14   sure of it.  That's fine.  You know, let's hope -- hopefully

15   not it have come back.  Think it through.

16   MR. BOSTANY:  Right.  And they're his filings.  He

17   filed some stuff in the trademark office, and he says he

18   doesn't want to have to go through his filings in the trademark

19   office.  The trademark office is about the validity of the

20   Ronson mark.  It is exactly on point to what's going on here.

21   THE COURT:  Okay.  Let's move on then.  So in terms of

22   -- so there's nothing further to identify other than the

23   Sweeney -- the date of the Sweeney declarations.  Is that

24   right?  So that can be done --

25   MR. SACKS:  Yes, Your Honor.

# EXHIBIT E

## DOCUMENTS IN TTAB PROCEEDING, CONSOLIDATED OPPOSITION NO. 91167353, THAT ARE IRRELEVANT TO *SANEI* CASE[1]

| Date of Filing | Document Filed (No. of Pages) | Exhibit(s) Attached (No. of Pages) | Total No. of Pages |
|---|---|---|---|
| 11/4/2005 | Notice and Trial Dates Sent (2 pages) | n/a | 2 |
| 3/14/2006 | Applicant's Motion to Compel Discovery (4 pages) | Declaration of Mary L. Grieco (2 pages)<br>*Ex. A:* Applicant's First Set of Interrogatories to Opposer dated December 13, 2005 (13 pages)<br>*Ex. B:* Applicant's First Request for Production of Documents and Things to Opposer dated December 13, 2005 (10 pages)<br>*Ex. C:* Letter from M. Grieco to J. Bostany dated January 31, 2006 re Opposer's overdue responses to Interrogatories and Request for Production of Documents (2 page)<br>*Ex. D:* Letter from A. Casellas to M. Grieco dated February 7, 2006 re their request for extension of time until 2/28/06 to respond to discovery requests (2 page)<br>*Ex. E:* Letter from M. Grieco to A. Casellas dated February 14, 2006 granting extension until February 28, 2006 (3 page) | 36 |
| 3/16/2006 | Suspended Pending Disp. of Outstanding Motion (2 pages) | n/a | 2 |
| 3/30/2006 | Stipulation (withdrawing Motion to Compel) (2 page) | n/a | 2 |
| 3/31/2006 | Motion to Compel Withdrawn (1 page) | n/a | 1 |

---

[1] In addition to the documents listed herein, there are two other documents that were filed before the three oppositions were consolidated, consisting of a Notice of the Oppositions and the Trial Dates.

| Date of Filing | Document Filed (No. of Pages) | Exhibit(s) Attached (No. of Pages) | Total No. of Pages |
|---|---|---|---|
| 5/15/2006 | Applicant's Motion to Enter Protective Order (4 pages) | Ex. A: Email from M. Grieco to Vanessa dated March 21, 2006 forwarding draft protective order (14 pages)<br>Ex. B: Email from M. Grieco to S. Anand dated March 22, 2006 re changes to protective order made by Vanessa (16 pages)<br>Ex. C: Email from S. Anand to Vanessa dated March 23, 2006 re withdrawing motion without prejudice, confidentiality issues and discovery responses (5 pages)<br>Ex. D: Email from S. Anand to Vanessa dated March 29, 2006 re signed stipulation, confidentiality issues and opposer's overdue/incomplete discovery responses (6 pages)<br>Ex. E: Form: Provisions for Protecting Confidentiality of Information Revealed During Board Proceeding (9 pages) | 54 |
| 6/08/2006 | Declaration of Opposer in Opposition to Motion to Enter Protective Order (3 pages) | n/a | 3 |
| 6/14/2006 | Withdrawal of Motion to Enter Protective Order (3 pages) | Ex. A: Signed Stipulated Protective Order (9 pages) | 12 |
| 6/29/2006 | Order regarding Protective Order (2 pages) | n/a | 2 |
| 6/30/2006 | Request that Opposer's Motion for Summary Judgment be Disregarded, or in the Alternative, That Applicant's Time to Respond be Extended (5 pages) | Declaration of Safia A. Anand (2 pages)<br>Ex. A: Letter from M. Grieco to J. Bostany dated June 28, 2006 re opposer's failure to serve Motion for Summary Judgment (3 page) | 10 |
| 7/6/2006 | Declaration of John P. Bostany (4 pages) | Ex. A: Signed Stipulation dated July 5, 2006 (1 page) | 5 |
| 8/10/2006 | Suspending Pending Disposition of Outstanding Motion (1 page) | n/a | 1 |

| Date of Filing | Document Filed (No. of Pages) | Exhibit(s) Attached (No. of Pages) | Total No. of Pages |
|---|---|---|---|
| 12/6/2006 | Stipulation re: Applicant's Time to Respond to Opposer's Motion for Reconsideration (4 pages) | n/a | 4 |
| 1/18/2007 | Change of Correspondence Address | n/a | 1 |
| 1/18/2007 | Stipulation for Extension of Time (1 page) | n/a | 1 |
| 1/18/2007 | Extension of Time Granted (1 page) | n/a | 1 |
| 1/29/2007 | Plaintiff's Motion to Compel Discovery (4 pages) | Ex. A: Plaintiff's First Set of Interrogatories dated February 8, 2006 (5 pages)<br>Ex. B: Plaintiff's First Request for Production of Documents dated February 8, 2006 (4 pages)<br>Ex. C: Applicant's Responses and Objections to Opposer's First Set of Interrogatories dated March 14, 2006 (9 pages)<br>Ex. D: Applicant's Responses and Objections to Opposer's First Request for the Production of Documents dated March 14, 2006 (6 pages)<br>Ex. E: TTAB Order dated June 29, 2006 granting protective order (2 pages)<br>Ex. F: Letter from J. Yoo to M. Grieco dated January 10, 2007 requesting responses to discovery requests (1 page) | 31 |
| 2/2/2007 | Defendant's Response to Motion to Compel [Declaration of Safia A. Anand] (5 pages) | Ex. A: Letter from J. Yoo to M. Grieco dated January 10, 2007 requesting applicant's complete responses to discovery requests (2 page)<br>Ex. B: Email from M. Grieco to J. Yoo dated January 18, 2007 agreeing to extending discovery deadline and opposer's overdue discovery responses (2) | 9 |
| 3/13/2007 | Defendant's Notice of Correction (3 | Ex. M: Letter from Bryan Reilly dated March 9, 2007 (2 pages) | 12 |

| Date of Filing | Document Filed (No. of Pages) | Exhibit(s) Attached (No. of Pages) | Total No. of Pages |
|---|---|---|---|
| | pages) | Ex. N: Applicant's Notice of Deposition (5 pages) | |
| | | Ex. O: Notice of Deposition (2 pages) | |
| 3/13/2007 | Applicant's Motion to Compel Opposer's Document Production, Deposition Testimony, and Motion for Protective Order (13 pages) | Declaration of S. Anand (13 pages) | 136 |
| | | Ex. A: Applicant's First Request for Production of Documents and Things to Opposer dated December 13, 2005 (10 pages) | |
| | | Ex. B: Applicant's First Set of Interrogatories to Opposer dated December 13, 2005 (13 pages) | |
| | | Ex. C: GMA Accessories, Inc.'s Responses and Objections to C. Ronson, Inc. First Set of Request for Documents dated March 16, 2006 (5 pages) | |
| | | Ex. D: GMA Accessories, Inc.'s Responses and Objections to C. Ronson, Inc. First Set of Interrogatories dated March 16, 2006 (8 pages) | |
| | | Ex. E: Letter from S. Anand to J. Yoo dated February 2, 2007 re opposer's incomplete responses to discovery (4 pages) | |
| | | Ex. F: Letter from J. Yoo to S. Anand dated February 12, 2007 re contacting S. Anand to discuss their supplemental responses to interrogatories, documents available for inspection and requiring advance payment of copy fees (2 page) | |
| | | Ex. G: Letter from S. Anand to J. Yoo dated February 14, 2007 re service of applicant's discovery responses, scheduling time to review their documents, and offering to make our documents available (2 page) | |
| | | Ex. H: Letter from D. Melissinos to S. Anand dated March 6, 2007 following up on E. Whitten's conversation regarding when they would receive our production of 500 documents and when they could copy same, and when we would be inspecting their documents (2 page) | |
| | | Ex. I: Letter to J. Bostany from S. Anand dated March 6, 2007 | |

| Date of Filing | Document Filed (No. of Pages) | Exhibit(s) Attached (No. of Pages) | Total No. of Pages |
|---|---|---|---|
| | | re misrepresentation of conversation between S. Anand and E. Whitten regarding document production (3 pages) | |
| | | *Ex. J:* Fax from D. Melissinos to S. Anand dated March 7, 2007 confirming telephone conversation wherein S. Anand stated that applicant's documents would not be available for copying at opposer's expense, and wherein D. Melissinos stated that opposer's documents would remain available for inspection and/or copying (2 page) | |
| | | *Ex. K:* Letter from S. Anand to J. Bostany dated March 7, 2007 re misrepresentation of conversations between S. Anand and D. Melissinos, and S. Anand and E. Whitten (3 pages) | |
| | | *Ex. L:* Letter from F. Charles to S. Anand dated March 9, 2007 providing a copy of a Notice of Deposition and co-existence agreement, and advising that they would provide copies of any documents at the same price they were charged (2 page) | |
| | | *Ex. M:* Letter from B. Reilly to S. Anand dated March 9, 2007 confirming that S. Anand is ending the document inspection at 2:00 p.m. and that she is not accepting the copied documents he has, but rather wishes them to be put onto a disk (2 page) | |
| | | *Ex. M [sic]:* Applicant's Notice of Deposition of Applicant [sic] Pursuant to Rule 30(b)(6) dated March 8, 2007 (5 pages) | |
| | | *Ex. N:* Opposer's notice to take the deposition of defendant pursuant to 30(b)(6) dated March 7, 2007 (2 page) | |
| | | Declaration of Mary L. Grieco in Support of Applicant's Motion to Compel Opposer's Document Production, Deposition Testimony and Motion for Protective Order, dated March 13, 2007 (7 pages) | |
| | | *Ex. A to M. Grieco Declaration:* Letter from J. Yoo to M. Grieco dated January 10, 2007 advising of applicant's incomplete | |

| Date of Filing | Document Filed (No. of Pages) | Exhibit(s) Attached (No. of Pages) | Total No. of Pages |
|---|---|---|---|
| | | discovery responses and enclosing opposer's second set of interrogatories and request for production (2 page) | |
| | | *Ex. B to M. Grieco Declaration:* Email from M. Grieco to J. Yoo dated January 18, 2007 agreeing to extension of discovery cut-off and following-up on opposer's responses to discovery (2 page) | |
| | | *Ex. C to M. Grieco Declaration:* Email from J. Bostany to M. Grieco dated March 7, 2007 re communication breakdown with S. Anand and agreeing to S. Anand's request to inspect documents on March 9 (2 page) | |
| | | *Ex. D to M. Grieco Declaration:* Email from M. Grieco to J. Bostany dated March 8, 2007 re communication breakdown in response to J. Bostany email of March 7, 2007 (3 pages) | |
| | | *Ex. E to M. Grieco Declaration:* Letter from M. Grieco to J. Bostany dated March 12, 2007 re filing motions to compel and motion for protective order and J. Bostany's conduct during the proceedings (4 pages) | |
| | | *Ex. F to M. Grieco Declaration:* Letter from J. Bostany to M. Grieco dated March 12, 2007 regarding discovery issues, S. Anand's conduct on March 9, and requesting all further communication be addressed to F. Charles (2 page) | |
| | | *Ex. G to M. Grieco Declaration:* Letter from M. Grieco to J. Bostany dated March 12, 2007 re J. Bostany conduct, requesting documents be downloaded onto a disk and filing a motion to compel (2 page) | |
| | | *Ex. H to M. Grieco Declaration:* wording taken from the www.johnbostany.com website which is operated by an unknown individual (2 page) | |
| | | *Ex. I to M. Grieco Declaration:* GMA Accessories, Inc. v. | |

| Date of Filing | Document Filed (No. of Pages) | Exhibit(s) Attached (No. of Pages) | Total No. of Pages |
|---|---|---|---|
|  |  | Positive Impressions, Inc., NYLJ Vol. 323, No. 90 (SDNY 2000) (10 pages)<br>Ex. J to M. Grieco Declaration: Playboy Enterprises Int'l v. On Line Entertainment, Inc., 2004 WL 626807 (SDNY) (10 pages) |  |
| 3/23/2007 | Defendant's Motion to Suspend Proceedings (3 pages) | n/a | 3 |
| 3/28/2007 | [Opposer's]Declaration in Opposition [to Motion to Compel] | Ex. A: Applicant's First Request for Production of Documents and Things to Opposer, dated December 13, 2005 (8 pages)<br>Ex. B: Letter from B. Reilly to S. Anand dated March 9, 2007 confirming that S. Anand is ending the document inspection at 2:00 p.m. and that she is not accepting the copied documents he has, but rather wishes them to be put onto a disk (1 page)<br>Ex. C: Letter from J. Bostany to M. Grieco dated March 12, 2007 regarding discovery issues, S. Anand's conduct on March 9, and requesting all further communication be addressed to F. Charles; fax transaction report re same (2 pages)<br>Ex. D: Fax from F. Charles to M. Grieco stating that the requested documents had been produced and questioning what documents we would like (1 page)<br>Ex. E: Letter from F. Charles to M. Grieco dated March 14, 2007 stating that the documents produced were organized and responsive, and asking that we advise them which documents we want (1 page)<br>Ex. F: Letter from J. Yoo to S. Anand dated February 12, 2007 re contacting S. Anand to discuss their supplemental responses to interrogatories, their documents available for inspection and requiring advance payment of copy fees (1 page)<br>Ex. G: Letter from D. Melissinos to S. Anand dated March 6, 2007 following up on W. Whitten's conversation asking when | 45 |

| Date of Filing | Document Filed (No. of Pages) | Exhibit(s) Attached (No. of Pages) | Total No. of Pages |
|---|---|---|---|
| | | they would be receiving our production of 500 documents and when they could copy same, and when we would be inspecting their documents (1 page)<br>*Ex. H:* Fax from D. Melissinos to S. Anand dated March 7, 2007 confirming telephone conversation wherein S. Anand stated that applicant's documents would not be available for copying at opposer's expense, and wherein D. Melissinos stated that opposer's documents would remain available for inspection and/or copying (1 page)<br>*Ex. I:* Email from J. Bostany to M. Grieco dated March 8, 2007 stating that the discovery violations are on applicant's end, and therefore that applicant's basis for a discovery extension is without merit (1 page)<br>*Ex. J:* Letter from F. Charles to S. Anand dated March 9, 2007 providing a copy of a Notice of Deposition and co-existence agreement, and advising that they would provide copies of any documents at the same price they were charged (1 page)<br>*Ex. K:* GMA Accessories, Inc. v. The Best Impressions, Inc., 2001 WL 1344997 (SDNY) (1 page)<br>*Ex. L:* Stipulated Protective Order dated June 12, 2006 (8 pages)<br>*Ex. M:* Withdrawal of Motion to Enter Protective Order dated June 14, 2006 (2 pages)<br>*Ex. A to Withdrawal of Motion to Enter Protective Order:* Stipulated Protective Order dated June 12, 2006 (8 pages)<br>*Ex. N:* TTAB Order dated June 29, 2006 granting protective order (2 pages) | |
| 4/4/2007 | Suspended Pending Disposition of Motion (1 page) | n/a | 1 |
| 4/6/2007 | Applicant's Response to Opposer's | Declaration of Safia A. Anand (6 pages) | 31 |

| Date of Filing | Document Filed (No. of Pages) | Exhibit(s) Attached (No. of Pages) | Total No. of Pages |
|---|---|---|---|
| | Opposition to Motion to Compel and Motion for Protective Order (12 pages) | *Ex. 1 to Declaration of Safia A. Anand:* Plaintiff's Second Request for Production of Documents dated January 8, 2007 (3 pages)<br>Declaration of Mary L. Grieco (4 pages)<br>*Ex. 1 to Declaration of Mary L. Grieco:* Letter from M. Grieco to F. Charles dated March 13, 2007 in response to F. Charles' fax of March 12, 2007 re Bostany firm's lack of good faith, requesting that opposer provide the documents and information set forth in Motion to Compel and stipulates to appropriate timing of depositions, applicant would withdraw the motion (2 page)<br>*Ex. 2 to Declaration of Mary L. Grieco:* Letter from M. Grieco to F. Charles dated March 14, 2007 stating that applicant will not be appearing for deposition on March 15, that applicant has filed a Motion for Protective Order and is continuing the GMA Accessories deposition until after the Motion to Compel and Motion for Protective Order are decided (2 page)<br>*Ex. 3 to Declaration of Mary L. Grieco:* Letter from M. Grieco to F. Charles dated March 19, 2007 requesting that opposer provide the documents identified in the Motion to Compel, and in S. Anand's Feb. 2, 2007 letter to J. Yoo and providing verified responses to interrogatories; and requesting the 248 pages of documents applicant identified at the document inspection, or to respond to the motion to compel (2 page) | |
| 4/20/2007 | Stipulation for an Extension of Time (2 pages) | n/a | 2 |
| 5/23/2007 | Change of Correspondence Address (1 page) | n/a | 1 |
| 6/7/2007 | Suspending Pending Disposition of | n/a | 1 |

| Date of Filing | Document Filed (No. of Pages) | Exhibit(s) Attached (No. of Pages) | Total No. of Pages |
|---|---|---|---|
| | Motion (1 page) | | |
| 9/27/2007 | Notice of Appearance (2 page) | n/a | 2 |
| | GRAND TOTAL NO. OF PAGES: | | 397 |